(In this trial, I was one of the counsel for the prisoner, and the duties that fell to my lot rendered it almost impossible to take notes. I have been compelled to rely chiefly upon memory and a few brief notes taken by an associate. The report is therefore imperfect, but it is hoped not *inaccurate* in any important point.

R. R. H.)

Commonwealth  
*vs.*  } Wednesday, May 7, 1851.  
Elizabeth Southard.

For the Commonwealth, J. B. Young.

For the Prisoner, John N. Davis, William Hancock and R. R. Howison. Mr. Byrd had also been counsel for the accused, but sickness prevented him from taking part in the trial.

The prosecution was for murder, and was founded on the same Statutes cited in Hastings' case, ante page 44.

The Indictment contained five counts, each charging the blow as given the 12th day of April, 1850, to William P. Walker, and that he lingered 'till the 22nd, and then died.

1. That she struck, with an iron griddle, in her right hand held, upon his head.

2. With an iron griddle, in both hands held, upon the hind part of his head.

3. With a sharp instrument to the (Grand) Jurors unknown, in her hands held, upon the back part of his head.

4. With a hard instrument, to the Jurors unknown, in her hands held, upon the hind part of his head.

5. With an iron griddle in her hands held, on his head, gave him divers wounds, fractures, contusions and bruises.

The prisoner appeared to be about 35 years of age; she had black hair, eyes bright, round and rather prominent; her complexion was somewhat dark. She was arraigned and pleaded "Not Guilty" to the indictment.

The following were the Jury:

S. G. Waldrop, R. D. Mitchell, Bernahrd Brill, William W. Carter, H. B. Ford, Samuel Phillips, Joseph Rennie, Wm. W. Morris, R. G. Walton, William Matthews, James Simpson, Stephen B. Sweeney.

For the prosecution:

Martha Hobson and Rebecca Hobson came up with other witnesses to be *sworn in chief* for the Commonwealth. The prisoner's counsel stated, that they would object to them as incompetent, on the ground that they were persons of colour.

*Young.*—Then, to raise the question, I offer them at once; I shall insist that they are competent as white persons, or at least that they have no more of negro blood than the accused, and therefore may testify against her.

*Prisoner's Counsel.*—Let them be sworn on their *voir dire.*

This being done, *Martha Hobson* testified that she had been registered as a free negro in Henrico County Court, and produced a copy of her Register, with the seal of the Court attached. *Rebecca Hobson* afterwards testified, that she had been registered as a free negro, in the same Court, but had not obtained a copy of her register. The Commonwealth's Attorney admitted her registry without requiring the production of the record.

*Young.*—I propose to ask Martha Hobson concerning her parentage.

*Prisoner's Counsel.*—We object; we think the register conclusive evidence as to the *status* of the witness. The Court ought not to go behind it. The Statute of Va. requires, that a free negro shall be registered, I. R. C. 438. Code of Va. 466. The County Court had complete jurisdiction, and ought not to have registered her if she was not a free negro; it is *res adjudicata,* and the decision of that Court upon the amount of negro blood

may be regarded in the light of a proceeding *in rem*, and so, binding upon all. If she claimed to be of *mixed blood*, to have less than one fourth of negro blood, she might have that question specially decided in her favour by the County Court. I R. C. 423. Code of Va. 458. Acts 1832-33, p. 51. Code 468.

*Young.*—This Court ought not to be concluded by the Register; These persons may have applied for registers as free negroes merely because they did not wish to be annoyed by questions as to their disabilities and their privileges. The Commonwealth was not a party when they were registered and is not bound by the action of the County Court.

*The Court* decided that the Registry was not conclusive.

*Martha Hobson, recalled.*—My mother was generally called an English woman; she was darker than I am; my father was reputed to be a white man; after I was born, my mother lived with a negro man as his wife; I lived with them several years; my own husband was generally thought to be a free man of colour; his colour was light; we came from Little York in Gloucester county.

*Cross-examined.*—I never remember to have seen the man that was said to be my father. We were never registered in Gloucester; we only had ourselves registered here because we feared some body might interfere with us; we associated with coloured people in Gloucester; Rebecca is my daughter.

*The Court.*—As questions somewhat novel arise in this case, I have thought it best to call in some physicians, who are probably experts in matters relating to the distinctions between the human races.

*The Prisoner's Counsel* objected to such testimony. If the Register be not conclusive, then the proper mode of determining the matter is, not by *inspection* either of the Court or of supposed experts, but by evidence of parentage and pedigree. Our Statute looks to this, when it declares that *a fourth or more* of negro blood shall exclude. How can the quantity be determined by experts? It can only be known by the parentage.—III Robinson's Prac. 215, State *vs.* Davis, 2 Bailey, (S. C.) 558.

*Young.*—The South Carolina case is against you. I think I remember a case, from King William, which went to the Court of Appeals, and that Court decided that *inspection* was a proper

mode of deciding such questions, but I cannot name the case.

*The Court.*—I have no doubt I might decide upon my own inspection, and if so, I may avail myself of the knowledge of those better skilled in such inquiries than myself.

*R. H. Cabell, M. D., sworn.*—I think the studies of a physician tend to give him peculiar skill and knowledge as to the distinctions between the races of men; comparative anatomy is one of his studies, and that treats of the differences in the anatomical structure—as the shape of the skull—the nose; the extremities, between the various races. (After examining Martha Hobson.) I do not find in this woman any evidences of negro blood; she seems to me to be a pure Caucasian.

*Cross-examined.*—I do not think it would be possible for a physician to say accurately how much negro blood there was in a person; as whether a fourth or more; it would be mere conjecture; this woman's nose *is* depressed, but she tells me it has been broken; I find nothing in her hair, or skin or general appearance indicating negro blood.

*Young.*—I ask that Doct. Cabell may now be permitted to examine the prisoner; I propose to prove that she has at least as much negro blood as either of the Hobsons.

*Prisoner's Counsel.*—We insist that the Commonwealth is bound to try the accused as a white person. The indictment treats her as such; it no where alleges that she is a free negro, or mulatto; the case of Young 2, Va. Cases 328, decides that when *the punishment* for an offence is different in a white person and in a free negro, the indictment against the latter must allege that he is such. The reasoning there, applies here; *the evidence* is different in the two cases, and the prisoner may be taken by surprise; indicted as a white person, she comes expecting to be tried as a white person, and may be unprepared with proof of her white pedigree, which the Commonwealth seeks to assail.

*The Court* said as the punishment in the case of murder, was the same for a white person and for a free negro, the indictment need not make a difference, yet the Commonwealth ought not to be prevented from shewing the competency of her testimony by proving if she could, that the prisoner was not one who could object to it.

*Doct. Cabell, recalled.*—(After examining Rebecca Hobson and

the prisoner,) I feel very reluctant to give testimony in this case, and would be glad to be excused; I do not wish to wound the feelings of any one. (*Pressed.*)—I *have* an opinion on the subject; I think the prisoner has negro blood; how much I cannot say; Rebecca Hobson also has negro blood, in my opinion, probably rather more than the prisoner.

*W. D. Haskins, M. D., sworn.*—I think it probable that a physician may have peculiar skill, and be an expert in such matters, though it is not strictly a part of his profession, and extended observations would be necessary to give much skill. My opinion is, that all three of these women have some negro blood; the old woman very little; I think the prisoner has more than the witness, Rebecca Hobson.

*Cross-examined.*—It is rather the province of the *naturalist* than of the physician, to examine these subjects; probably a physician would not have much more skill than any man of general scientific reading. As to the prisoner, I judge chiefly by the hair and the skin; her hair is shorter than is usual in white women; yes, it may have been cut, but it has the appearance of having its natural length; it has also a tendency to curl—not to curl merely, but to a kind of "wavy curl," not easily described, but which is different from the curl in the hair of white women. I do not think it possible for a physician to say whether there be a fourth of negro blood.

*Albert M. Snead, M. D., sworn.*—I think it pertains more to the naturalist than the physician, to solve this question, but a physician may acquire some peculiar knowledge as to it, not merely from his reading but from his practice among the two races, as they exist in our society. I am of opinion all these women have negro blood; the old woman has the least; I think the other two have about the same quantity.

*Cross-examined.*—I judge by the hair and the skin and some other appearances, (which need not be detailed.) There is something *indescribable* in the feeling of the hair and the looks of the skin, by which I think the presence of negro blood may be detected. I cannot say how much.

*C. Wortham, M. D., sworn.*—I do not think I can call myself an expert on this subject; I do not feel competent to give the

Court instruction and guidance on the question. Other physicians may feel such competency, but I do not.

For the prisoner.

*Isaac A. Goddin, sworn.*—I was in the County Court when Elizabeth Southard was before them in some case, and the Court decided that she was a white person, (here an extract from the record of the County Court was exhibited by *Mr. Davis.*) We had sufficient evidence, and I heard—

*Young.*—What Mr. Goddin heard from others, cannot be given in evidence.

*Prisoner's Counsel.*—Upon a question of pedigree, hearsay testimony is admissible; this is an exception to the general rule, and we state it thus broadly; if there be a restriction let the Commonwealth point it out.

After argument,

*The Court* said, that the declarations of a member, or connection of the prisoner's family, might be given in evidence on the question.

*Jacob Holloway, sworn.*—I knew the prisoner's parents in Hanover county; they were cousins to each other, and were both descendants from the Madisons of Caroline; her father and mother were regularly married and always associated with white people, and were very reputable people; I thought them white people; they always passed for such; I knew her grand parents who were Madisons; the Madisons were a dark family.

*Cross-examined.*—Her grandfather was a Madison; he was dark, but not darker than I have seen people who were known to be white people; I think I have heard, a long time ago, that there was some rumour of a stain in the blood of the family, but I know nothing of it myself.

*Fleming P. Harris, sworn.*—I knew her parents in Hanover, they were very respectable persons, and were recognized as white people; I have known her father to muster in the militia.

### THURSDAY, MAY 8TH, 1851.

For the prisoner:

*James H. Conway, M. D., sworn.*—I do not think a physician from his professional studies, would be more skilful in detecting the differences between the races than any other well-read man.

11

There are *naturalists* who make this their peculiar study. The object of medical study is to become acquainted with the human system generally, and the causes and cure of its maladies, and in my opinion, this may be done to the full extent to which the science now goes, without any peculiar knowledge of the distinctions between the races.

*L. R. Waring, M. D., sworn.*—I think a physician need not have any peculiar skill in such matters; I cannot claim to be an expert in them, though I have endeavoured to attend to the studies of my profession. It must, to a great extent, be matter of conjecture.

For the prosecution :

*M. Burton, M. D., sworn.*—I have paid much attention to the differences between the human races. I have done this as a *naturalist*, and not merely as a physician. I consider myself as having thus acquired peculiar skill and knowledge on the subject. (After examining the prisoner and the two witnesses.) I think the elder woman, (Martha Hobson,) has no African blood in her; I do not find any evidences of it in her. I think both the other women have negro blood, and of the two, the prisoner seems to me to have the least.

*By the Court.*—I think neither of them can have as much as one-fourth of negro blood.

Neither party desiring to offer any farther evidence on the preliminary question, the whole subject involving the competency of the witnesses, was argued before the Court.

*Judge Caskie.*—Even without the testimony of the physicians, I might have decided this question upon my own inspection, but I desired aid and have certainly derived from the evidence strong confirmation of the view I was inclined at first to take. The questions as to the conclusiveness of the Register, and the effect of the indictment upon the rights of the prisoner have been already considered. Our Statute admits as competent witnesses, even against a white person, those free persons of color who have less than one-fourth of negro or Indian blood. As to the prisoner, I am convinced that she has African blood, but I am equally convinced that she has much less than one-fourth, and therefore she is to be tried as a white person. As to Martha Hobson, all that I have heard and seen leaves on my mind the

strong opinion that she has no African blood at all; that she is
a pure Caucasian, or if her blood be mixed, that she may have a
slight tinge, much less than a fourth of Indian blood. As to
Rebecca Hobson, I at first supposed that she had much more
negro blood than the prisoner, but this view has been modified
by a closer inspection, and I am now of opinion that she has
very little if any more, and that her quantity of African blood is
much less than one-fourth. With these views, I must decide
that both Martha and Rebecca Hobson are competent witnesses.

(*Mr. Young* being absent, B. B. Minor, Esq., acted as Prose-
cuting Attorney.) The evidence for the Commonwealth com-
menced.

*John H. Walker, sworn.*—I heard that William Walker had been
much hurt at Martha Hobson's; I think I heard of it Saturday,
the 13th of April, 1850. I went to the house and found him sit-
ting up by the chimney side, with his head bound up. I asked
him if he would come home with me; he said, "not then;" the
next evening he came to my house and he staid there until he
died, which was, I think, on the Monday week after he was hurt.
He sometimes walked about for a day or two after coming to my
house, but did not talk much; he seemed in a stupor several
days before he died.

*Cross-examined.*—He was my cousin; we did not have much
to do with each other; he would take "sprees" sometimes, but
I did not think he was then more violent than other men; he
was a very peaceable man when sober. (The Commonwealth's
Attorney intimated that he would call this witness again.)

*J. Mull, sworn.*—A few days after this affair happened, I saw
William Walker, walking on the side way in Rocketts; I think
he was on the other side of the bridge over the creek that runs
through Rocketts. He had his head tied up; I joined him and
we talked some; I asked him how he got hurt; he said he got
it "skylarking" at Martha Hobson's. He went on to his brother's.
I don't think I saw him out afterwards.

*Cross-examined.*—"Skylarking" is a phrase often used by sai-
lors; it means pretty rough play, as if we were to take all the
tables, desks, books and inkstanks in this room and throw them
all about in confusion. I knew William Walker; he got drunk
sometimes, but when sober he was quiet.

*Martha Hobson, sworn.*—The night this thing happened, Betsey Southard was at my house, and so was William Walker; some time after dark we took something to drink; they commenced romping about the room; they proposed to dance; I told them I didn't believe they could dance as they did in old times; they romped about the floor, and after a while Bill Walker went out and got one of the Watchmen to come; when he came he asked what was the matter; we were all quiet; the Watchman said to Bill Walker, "if you come and make a fuss again, I will put you up the chimney." When the Watchman went away, Betsy asked Walker what he brought the Watchman for; he said, for her; then she proposed to send out for some liquor and said if he wouldn't pay for it, she would. The liquor came, and after awhile they played again, and Betsey threw him down on the floor; they were down some time, and then they got up and had another wrestle and she threw him again. Then she got up and I saw her go off with her body half bent, (here the witness shewed the position,) towards the fire-place. He ran after her, and kicked her in the mouth, (Betsey said,) so hard it shook every tooth in her head; then she said, "Oh! damn you, are you up to that," and she caught up this griddle and struck him on the back of the head as he turned off. (The griddle was of iron and revolved upon a centre.) He fell right down and lay still; I said, "Lord, Betsey, you've killed him;" she said, "Oh, no, he ain't dead, let him bleed a little." After awhile he came too; I put some soot from the chimney on his head, and bound it up with a bandage and he laid down on the bed.

*Cross-examined.*—William Walker lived with me as my husband, we were never married. We all drank that evening; I had drunk some as well as the rest; I don't know why Walker went for the Watchman; he didn't like Betsey much any how; I thought they were playing at first, but I think he was getting very "mad" when she threw him down; I think he was "mad" when he ran after her to the chimney; he ran very fast; after he kicked her, he turned off to the right; there was a table the way he turned; under it there was a skillet with a handle to it, and there were some other things. When they fell down the first time, they staid down, it seems to me, perhaps a quarter of an hour; they said nothing all that time. I had once a little dif-

ficulty with Elizabeth Southard, but nothing to speak of. Rebecca was present most of the time the night this thing happened to Walker.

*Rebecca Hobson, sworn.*—I was out of the house the first part of the night; when I came in, they were dancing and playing about the floor: I drank, I think, one glass; Walker went out and got the Watchman, but when he came, we were not doing any thing, and he went away; Betsey and Walker wrestled and she threw him; I only saw her throw him once; she had said to me, " pull my cape down," and I pulled it down; while they were on the floor, he kicked her in the mouth, then she ran and got this griddle and struck him on the head. He fell down and seemed dead, but came too. When she took the griddle she said, " Oh, are you up to that." I didn't hear her say any thing more.

*Cross-examined.*—I did not see Walker run up to the chimney place and kick Betsey in the mouth; I did not see her go off, half bent, to the fire-place. I did not see mother put any soot on his head. There was a skillet under the table near him ; there was an axe in the house, I think it was near the door; they fell nearer to the door than to the fire-place. Walker was sometimes very violent; he had choked my mother a few days before. He was not a large man. I think I do remember some difficulty between mother and Betsey.

*L. R. Waring, M. D., sworn.*—I was called to see William Walker, I think, on Wednesday evening, before his death. I found him in a state approaching stupor. There was a wound on his head which penetrated through the scalp; the skull was also cut through and a piece of the bone driven in upon the brain; I used the trephine to elevate this fragment of bone; I had little hope of his life; he continued to live, generally in a comatose state, until Monday, when he died. The blow, I think, might have been given with an instrument like this griddle, and must have been struck with considerable force. I have no doubt the blow caused his death.

*Cross-examined.*—The wound was on the left side of the posterior part of the head; it was oblique in its direction; I saw no mark of the foot of the griddle on the skull; the deceased seemed to

me to be a man of ordinary size, and quite muscular, but I could not judge accurately, as I always saw him lying down.

*John H. Walker, recalled.*—On Wednesday evening, William Walker was much worse and was put to bed ; he said he did not think he should ever get well ; he seemed in earnest when he said it ; I asked him if I should send for a doctor, and he said yes.

The Prosecuting Attorney, upon this foundation and the former evidence, now proposed to give the declarations of the deceased as to the person who struck the blow, and its attending circumstances to the Jury.

*Prisoner's Counsel.*—We shall oppose this, not only on the ground that according to the common law decisions, the foundation is not sufficient, but on the farther ground that the Constitution of the United States forbids the introduction of dying declarations, by necessary inference from Art. VI. Amend. (Code of Va. 51.) How can the accused be " confronted with the witnesses against him," if these declarations of a man not under oath, and *not subject to cross-examination*, can be received ? and so, *Judge Baxter* of Georgia, has recently ruled out dying declarations—(in a case reported in Washington (Ga.) Gazette and in the Richmond Times, May 8, 1851.) Hunter Hill's case does not shut up this question. There, nothing was relied upon by the prisoner's counsel, except the *Bill of Rights of Va.*; the Constitution of the United States was not spoken of. But if dying declarations can be received at all, the rule now approved will exclude them in this case. It is not enough that the deceased thought he should never recover.—Cowen & Hill's Notes to Phillips on Ev. iii. 607, 608. He must think death to be impending, so that his mind is solemnized by the thought.

*Minor.*—I. The Bill of Rights of Va. is broader in its language than the Constitution of the U. S. Compare Art. 8, Bill of Rights with Art. 6 amend. Constitution. So, the General Court, in deciding that the Bill of Rights did not exclude dying declarations, necessarily decided that the Constitution of the U. S. did not. II. The rule only requires that the deceased shall believe he must soon die ; this was the case here.

*The Court.*—I do not think Art. VI. amend. Constitution of the U. S., applies at all to the State Courts, or gives any rule to

them. The words are, "an impartial Jury of the *State and Dis_trict* wherein the crime shall have been committed, *which district* shall have been previously ascertained by law." This must refer to the U. S. Courts. But while I am bound by the decision in Hunter Hill's case, and am perfectly satisfied of the propriety of admitting dying declarations to a Jury, yet, in the case at bar, I do not think the mind of the deceased was so bereft of all hope of life, and so impressed as to the solemnity of his position, as to make his declarations proper evidence; I therefore exclude them.

The evidence for the prosecution closed.

For the defence:

*William F. Carvedo, sworn.*—The morning after this affair, I heard Isaiah Walker say, his brother was killed; I went to the house and peeped through a window and saw Wm. Walker sitting up in bed, I asked him who struck him, he said a woman up stairs: I went part of the way up stairs, just high enough to see, and I saw a woman lying on the floor, wrapped up in old clothes or something of the kind; I could not tell who she was. A man named Peter Bell was up there, just buttoning on his clothes; I saw no other woman.

*Joseph Holloway, sworn.*—I knew the prisoner in Hanover, and never heard any thing against her. She was always considered of a peaceable disposition; she staid with my mother sometimes and I heard her speak of her favorably. I have known nothing of her since she was in Richmond,

*Fleming P. Harris, sworn,*—I have seen the prisoner in Hanover where her parents lived; I never heard any thing against her there, but in the last four or five years she has been beyond the reach of my observation.

The evidence closed.

### FRIDAY, MAY 9TH, 1851.

The argument before the Jury commenced at 9 A. M. and closed at about half past 12. The Jury retired and in half an hour returned with a verdict of "Guilty of Voluntary Manslaughter," ascertaining the term of confinement in the penitentiary at one year.

A motion for a new trial was submitted without argument and

overruled ; *the Court* remarking that he had seldom seen a case in which the verdict more accurately responded to his view of the law and the evidence.

Exceptions had been taken in behalf of the prisoner to various decisions of the Court, with a view, if expedient, to apply to the General Court for a writ of Error, but the prisoner upon her own motion, after conference with her counsel, signified her assent to the verdict and requested that sentence should be at once pronounced, which was done accordingly.